RE/MAX INTERNATIONAL, INC.; A.E.B.T.S., Inc., d/b/a Re/Max Crossroads Properties; T.M.A.T.N.B., Inc., d/b/a Re/Max Affinity, Inc.; D.F.I., Inc., d/b/a Re/Max Results; Joseph P. Grady, Inc., d/b/a Re/Max Xpress; McGrew Realty, Inc., d/b/a Re/Max Key Realty; Property Professionals, Inc., d/b/a Re/Max Property Professionals, Plaintiffs–Appellants/Cross–Appellees,

Re/Max Northeast Ohio Limited Partnership; Zames Realty, Inc.; Realty Properties, Inc.; True Independence Partnership; R.E.P., Inc., Intervenors–Appellants/Cross–Appellees,

v.

REALTY ONE, INC. (96–3362/3469); Smythe Cramer Company (96–3362/3470), Defendants–Appellees/Cross–Appellants.

Nos. 96–3362, 96–3469 and 96–3470.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 30, 1997.

Decided April 6, 1999.

Stephen J. Squeri (argued and briefed), Charles M. Kennedy, IV, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Barbara B. McDowell (briefed), Jones, Day, Reavis & Pogue, Washington, DC, Edward W. Cochran, Cochran & Cochran, Shaker Heights, Ohio, for Plaintiffs–Appellants/Cross–Appellees.

Jeffrey Baddeley (briefed), Richard M. Markus (argued and briefed), Joyce M. Papandreas, Porter, Wright, Morris & Arthur, Cleveland, Ohio, for Defendant–Appellee/Cross–Appellant Realty One, Inc.

John J. Eklund (argued and briefed), Thomas I. Michaels (briefed), Philip J. Carino (briefed), Maura L. Hughes (briefed), Calfee, Halter & Griswold, Cleveland, Ohio, for Defendant–Appellee/Cross–Appellant Smythe Cramer Company.

Robert O. Driscoll, Jr. (briefed), State Solicitor, Columbus, Ohio, for Amicus Curiae State of Ohio.

Peter M. Gerhart (briefed), Paul C. Giannelli (briefed), Case Western Reserve University School of Law, Cleveland, Ohio, for Amici Curiae Ohio Manufacturers' Association, Ohio Hospital Association.

Before: RYAN and BATCHELDER, Circuit Judges; CAMPBELL, District Judge.*

RYAN, Circuit Judge.

This is an antitrust case involving northeast Ohio real-estate brokers. Plaintiffs accuse the defendants, and one of the defendants accuses the plaintiffs, of engaging in illegal business practices designed to drive the other out of business, in violation of state and federal antitrust laws. Following extensive pretrial motion activity, and in the course of four written opinions comprising some 400 pages of discus-

* The Honorable Todd J. Campbell, United States District Judge for the Middle District of Tennessee, sitting by designation.

sion, the district court entered judgments dismissing all of the plaintiffs' claims on summary judgment, and all but one of defendant Realty One Inc.'s counterclaims, either on summary judgment or for failure to state a claim.

Plaintiffs and intervenors, whom we shall call plaintiffs or Re/Max, appeal from the entry of summary judgment against them on their state and federal antitrust claims. Defendant Realty One cross-appeals from the Fed.R.Civ.P. 12(b)(6) dismissal of its complaint for failure to state a claim on some of its counterclaims and from the Fed.R.Civ.P. 56 entry of summary judgment on others.

We hold that, although the district court engaged in an exhaustive review of the merits of the claims in this case, it erred in disregarding important aspects of the evidence presented by the plaintiffs' expert witness, and in rejecting evidence that the defendants had the ability to exclude competition from the marketplace. We conclude that there is sufficient evidence to create a justiciable issue whether the defendants violated §§ 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1 & 2, and, therefore, summary judgment should not have been entered against the plaintiffs.

Finally, we hold that Realty One's counterclaims are not legally supportable and thus were properly dismissed.

## I. BACKGROUND

### A. The Nature of the Controversy

To provide a contextual framework for our discussion of the merits of this difficult case, we first begin with a few observations concerning the unique nature of antitrust law, and then proceed to a description of the doctrinal predicates that underlie the parties' claims.

Unlike the assumption that informs most areas of tort and contract law, in the marketplace certain "harms" are not only accepted, they are encouraged. Fundamental canons of antitrust law recognize the legitimacy of permitting the natural economic forces of free enterprise to drive inefficient producers of goods and services out of the market, and replace them with efficient producers. Ordinarily, when an efficient enterprise displaces an inefficient one, we conclude that consumers' economic interests are better served, despite that the inefficient enterprise is injured or even destroyed. Conversely, when inefficiency triumphs over efficiency, consumers lose because they receive lower-quality, higher-priced products and services.

Manifestly, the judiciary is ill-suited to evaluate directly the efficiency of business practices. But antitrust doctrine provides a methodology for courts to distinguish between instances of efficiency displacing inefficiency, which is not, *per se*, an economic harm and for which the law offers no redress, and inefficiency displacing efficiency, which, if achieved by the use of unfair means, the law seeks to prevent or rectify. In general, then, antitrust law seeks to identify situations in which enterprise organizations rely on sheer economic power to drive out an innovative but less powerful rival, *rather than* attempting to do so by improving the quality or lowering the cost of their products or services.

At the heart of the disagreement between the parties to this lawsuit are disputes about (1) who is economically dominant and (2) who employs the best formula for compensating real-estate sales agents for their services. Because it is conducive to more easily understanding the nature of the two-pronged dispute between the parties, we begin by addressing the second aspect first—who employs the more efficient formula for compensating sales agents.

As most home buyers are aware, ordinarily, a real-estate agent who lists a house for sale agrees to represent the homeowner/seller, doing so for a fixed fee, called a "commission," that is a percentage of the selling price. If another real-estate agent, working for a different broker,

brings a purchaser to the deal, the two agents usually split the commission 50/50. If, for example, the sales commission on the listing is 7% of the sales price, the listing agent splits the 7% commission $\frac{50}{50}$ with the agent who produced the buyer. Then, ordinarily, although there can be different arrangements, each sales agent must split his or her 3-½% commission $\frac{50}{50}$ with the broker with which he is affiliated. To continue the example, if a house sells for $200,000 and the sales commission is 7%, or $14,000, the listing agent receives $7,000, and the agent representing the buyer receives $7,000. Then, under the traditional practice, each agent pays one half, or $3,500, to the broker with which he is affiliated. But Re/Max agencies, throughout the Re/Max nationwide franchise system, compensate their sales agents very differently.

Under its system, Re/Max requires that its franchisees adopt the "Re/Max 100% Concept" which allows real-estate sales agents to receive 95% to 100% of their share of sales commissions, instead of the traditional practice of splitting commissions $\frac{50}{50}$ with the salesperson's broker/employer. So, as in the foregoing example, if either the listing agent or the agent producing the buyer is a Re/Max sales agent, his commission, rather than being one half of 3-½% of the sales price, or $3,500, is the full 100% of the partial commission, or $7,000. In return, Re/Max agents pay the broker/employer a flat monthly fee for desk space, telephone services, secretarial support, and the like. Re/Max contends that the 100% Concept attracts more experienced, more knowledgeable—and this is important—more efficient agents. Indeed, Re/Max recruits and hires only experienced agents, on the theory that novices could not survive without a guaranteed minimum income if commissions were not immediately forthcoming—and ordinarily they are not—when inexperienced agents are "in training" and learning the business.

We now return to the first part of plaintiffs' two-pronged antitrust argument—that defendants are economically dominant in the real-estate market or markets in question.

Re/Max contends that defendants Realty One, Inc. and Smythe Cramer Company have dominance in the northeast Ohio real-estate markets and have used that dominance to defeat Re/Max's attempt to introduce its unique and, it claims, more-efficient sales-agent compensation system. Re/Max argues that the defendants control the northeast Ohio markets in two ways: (1) by obtaining the listings for a large majority of homes for sale and (2) by attracting and employing the large majority of experienced real-estate agents. There is nothing, of course, illegal in that. What is illegal, according to Re/Max, is the means it claims the defendants have employed to perpetuate that dominance—the defendants' so-called "adverse splits" policy, which we shall explain in due course. According to Re/Max, the real and intended effect of this policy is that the defendants essentially refuse to sell homes to customers brought to them by Re/Max agents. In consequence, Re/Max argues, it cannot attract experienced agents for its sales force, because, given Realty One's policy of boycotting purchasers produced by Re/Max, experienced agents would not make enough money working for Re/Max. Without experienced agents, Re/Max argues, it is prevented from entering the northeast Ohio real-estate market.

Realty One, on the other hand (but not Smythe Cramer), counterclaims that *Re/Max* is attempting to become, through unfair competition, the dominant player in the northeast Ohio real-estate markets. It argues that Re/Max, with its national network of franchisees, is purposely operating at a loss in northeast Ohio by offering greater compensation to experienced agents than it can afford or the market can bear—a sort of predatory pricing—in order to capture the market in experienced agents and thereby establish a real-estate monopoly in northeast Ohio.

Not surprisingly, each party avers that its brokerage system is most efficient. Re/Max maintains that the economies of scale of which it takes advantage in advertising, support services, and the like, and its ability to attract more-experienced agents by paying them 95% to 100% of their sales commissions (the 100% Concept), result in better services to home buyers and sellers.

Realty One and Smythe Cramer claim the Re/Max system is less efficient than theirs in two ways. First, Re/Max has at least three levels of administration: the national franchisor, the regional subfranchisor, and the local franchise. Realty One and Smythe Cramer, on the other hand, are locally based and operated. Second, the "Re/Max 100% Concept" inhibits the recruitment and training of new agents and drives up costs in the labor market. That is, Re/Max makes no investments in agent training, preferring the short-term gain realized by hiring experienced and already successful agents. According to the defendants, customers are ill-served by this practice in the long run because no new agents are ever trained, and experienced agents eventually require more and more compensation as brokerage services become more and more scarce. Conversely, the defendants maintain, they invest substantially in training new agents.

Having set out in general terms the economic context for the disputes in this case, we turn now to a closer look at the parties themselves and the factual and legal bases for their respective claims.

First of all, it must be understood that the plaintiffs accuse the defendants, and defendant Realty One accuses the plaintiffs, *inter alia*, of violating both §§ 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1, 2. Section one, in relevant part, states:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

Section 2, in relevant part, states:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

## B. The Parties

Plaintiff Re/Max International, Inc. is a franchisor of a real-estate brokerage system that it sells to franchisees across the nation, including northeast Ohio. Intervenor Re/Max Northeast Ohio Limited Partnership is the Re/Max subfranchisor for the northeast Ohio region, an area consisting of Cleveland and the surrounding metroplex. The remaining plaintiffs and intervenors are all franchises located in northeast Ohio, operating in some 14 communities.

Realty One and Smythe Cramer are the largest real-estate brokerages in northeast Ohio in terms of market share. Realty One appears to have 40 offices in northeast Ohio, and Smythe Cramer, 34. The reader interested in knowing the particular communities in which each brokerage operates, at least according to the record of trial, may wish to consult the addendum at the end of this opinion.

## 1. The Plaintiffs' Claims

During discovery, plaintiffs obtained the deposition of an expert witness, Dr. Donald L. Martin, whose testimony presents an important issue in this appeal, as we shall discuss in due course. In a portion of his testimony that is essentially unchallenged, Dr. Martin presented statistical data as follows:

In a majority of the 161 cities and towns in northeast Ohio, the defendants' combined market share exceeds 50%. That is, in 85 out of 161 communities, the defendants earn more than half of all the brokerage fees generated from residential home sales. In all but seven of these cities and towns, the defendants' combined market share is more than 20%. Realty One alone has at least a 40% market share in 37 political subdivisions; Smythe Cramer, more than 40% in 23. Also, according to the plaintiffs' expert, this large market share, with a corresponding lack of significant market share by the next largest competitor, results in Realty One's control of the market in 26 communities, and Smythe Cramer's, in 19. In nine of the cities and towns in which Re/Max has offices, the defendants enjoy the following *combined* market share: Rocky River (78.5%), Aurora (75.6%), Westlake (68.2%), Hudson (67.2%), Concord Township (64%), Strongsville (60.6%), Broadview Heights (55.7%), Mentor (54.1%), and Painesville (49%). The plaintiffs' expert apparently did not analyze the defendants' market share in Akron, Bay Village, Canton, Dover, and North Canton, the other five northeast Ohio towns in which Re/Max has offices.

We have said that Re/Max claims, *inter alia,* that it is the *means* the defendants have chosen to dominate the relevant market for hiring real-estate sales agents— their "adverse splits" policy—which violates state and federal antitrust laws. That is, beginning in 1987, the defendants implemented the adverse-splits policy against all Re/Max agents. Although, as we have explained, the standard practice in the industry is that commissions are split equally when one brokerage brings the seller and another brokerage brings the buyer to a transaction, in 1987 Realty One and Smythe Cramer began notifying Re/Max brokerages that the split would be 70/30 or 75/25, in favor of the defendants, whenever a Re/Max agent was on the other side of the table from a Realty One or Smythe Cramer agent. It is undisputed that the policy was designed to deter defections of sales agents from the defendants' employment to the plaintiffs'.

The plaintiffs allege that neither of the defendants imposed the adverse-splits policy independently, but rather made an agreement to do so, thereby violating § 1 of the Sherman Act, which prohibits any combination or conspiracy that unreasonably restrains trade. We will address the specific provisions of the Sherman Act more fully, in due course. The plaintiffs also allege that in the communities in which one or the other defendant by itself controls the market for experienced real-estate agents, each defendant, through the implementation of this adverse-splits policy, has used its power to effectively discourage experienced real-estate sales agents from working for Re/Max. The goal, which indeed has been achieved, according to plaintiffs, is to drive Re/Max franchises out of business, or to prevent Re/Max franchises from establishing themselves in the first place, thereby creating an illegal monopoly in violation of § 2 of the Sherman Act.

In simplified terms, then, the plaintiffs' claim is that the defendants control the market for knowledgeable and experienced sales agents who have developed an expertise in certain communities in northeast Ohio, and, through the unfair adverse-splits policy, have prevented Re/Max from recruiting those agents, thereby depriving Re/Max franchises of the information and expertise they need to effectively serve buyers and sellers of homes. Instead of competing with Re/Max in the experienced-agent market by raising the com-

pensation of their own experienced agents, as Re/Max has, the defendants have tried to drive Re/Max out of northeast Ohio by imposing the adverse splits, which do not allow Re/Max agents, and thus Re/Max franchises, to do business profitably. The plaintiffs maintain that the adverse-splits *conspiracy* constitutes a boycott or refusal to deal, is *per se* illegal under § 1 of the Sherman Act, and does not require proof that trade is unreasonably restrained. They also argue that, in those areas where one defendant has a *monopoly*, the adverse-splits policy has been implemented in order to increase or maintain the defendant's market power in that particular area in violation of § 2 of the Act.

The district court entered summary judgment for the defendants on the plaintiffs' § 1 conspiracy claims, finding that no conspiracy had been proved. It dismissed the plaintiffs' § 2 claims, finding that the plaintiffs failed to define the relevant markets in which the defendants allegedly exercised monopoly power and, in any event, failed to prove monopoly power was exercised.

The plaintiffs point to numerous facts in the evidence that they contend demonstrate that Realty One and Smythe Cramer *conspired* to set the adverse-splits commission rates. First, Leo Lee, a former Realty One employee, testified that the CEO of Realty One, Vince Aveni, admitted that he and Smythe Cramer's principal shareholder, L.B. McKelvey, agreed to impose the adverse-splits policy. Second, the plaintiffs' expert, Dr. Martin, opined that *independent* imposition of adverse commission splits would be economically irrational for either defendant, even after one defendant had already adopted the policy. Third, the plaintiffs claim that the defendants offered merely pretextual explanations for their conduct, explanations that clearly cannot be believed. That is, the adverse-splits policy cannot be an attempt by the defendants to protect their training investments in their agents, because inexperienced real-estate agents essentially

"pay" for their own training because they realize relatively few sales early in their careers. Also, despite the defendants' statements to the contrary, each defendant must at least have considered what the other would do in response to its claimed independent adoption of the adverse-splits policy. Fourth, the leaders of Realty One and Smythe Cramer were once business associates, and in 1987 had the opportunity to meet and work out an adverse-splits agreement. And fifth, the adverse splits were imposed against the various Re/Max franchises by the defendants almost simultaneously. In fact, the record indicates that Realty One imposed a 30% split and Smythe Cramer a 25% split on the following Re/Max franchises on the following dates:

| Date | Issuing Defendant | Re/Max Broker |
|---|---|---|
| 1.22.90 | Smythe Cramer | Re/Max Reality |
| 1.31.90 | Realty One | Re/Max Reality |
| 5.30.91 | Smythe Cramer | Re/Max Specialists |
| 7.10.91 | Realty One | Re/Max Realty Properties |
| 11.13.91 | Smythe Cramer | Re/Max Realty Properties |
| 5.27.92 | Smythe Cramer | Re/Max Xpress |
| 7.17.92 | Realty One | Re/Max Xpress |
| 2.15.93 | Realty One | Re/Max Results |
| 2.17.93 | Smythe Cramer | Re/Max Results |
| 3.2.93 | Smythe Cramer | Re/Max Affinity |
| 4.8.93 | Realty One | Re/Max Affinity |
| 11.12.93 | Smythe Cramer | Re/Max Crossroads |
| 1.4.94 | Realty One | Re/Max Crossroads |
| 4.20.94 | Smythe Cramer | Re/Max Partners |
| 5.12.94 | Realty One | Re/Max Partners |
| 8.16.94 | Smythe Cramer | Re/Max Experts |
| 12.19.94 | Smythe Cramer | Re/Max Premier Service |

It appears that the remaining plaintiffs received notice of the adverse-splits policy before 1990, although the record is unclear as to the exact dates.

Similarly, according to the plaintiffs, Realty One and Smythe Cramer have market power in the cities and towns where one defendant has at least a 40% market share, and no other competitor is close to having 40%. Thus, Realty One purportedly has monopoly power in 26 cities and towns; Smythe Cramer, in 19. The plaintiffs claim that each city and town in northeast Ohio is its own market, because, unlike such products as automobiles or video equipment that can be sold anywhere, the expertise possessed by real-estate agents is specific to small geographic areas. Each agent trades in his "knowledge of the physical characteristics of the stock of lo-

cally listed housing, of the socio-economic characteristics of the population of local homeowners and of the nature of local community amenities (e.g., schools, churches, police security, etc.) together with other relevant details." The defendants advertise and seek market share by reference to particular cities and towns, and the listing services in northeast Ohio list homes for sale by political subdivision. According to plaintiffs, in light of the intensely local nature of the residential real-estate business and the fact that brokerages use political boundaries for other purposes, individual cities and towns must each comprise a separate marketplace in the market for real-estate services. The plaintiffs claim that Realty One and Smythe Cramer each have a monopoly on experienced agents in certain cities and towns, and on the supply of persons with homes for sale, and that the defendants have used these monopolies to keep their agents from accepting better-paid positions with Re/Max affiliates by imposing adverse commission splits. That is, they refuse to sell listed homes—except on terms that are not profitable for the Re/Max agent—to buyers brought by Re/Max agents, including, of course, any former agent of the defendants who has defected to Re/Max.

### 2. The Defendants' Response

Realty One and Smythe Cramer deny conspiring or exercising monopoly power to impose adverse commission splits. Each defendant maintains that it *independently* decided to use adverse commission splits to fight a competitor who was trying to lure away its most successful agents and deprive it of a return on its investment in the training of its agents. The defendants claim that as a matter of economic self-defense they decided to cut the amount of commission paid to Re/Max agents, with the result that agents who defected to Re/Max and received *all* of a 25% or 30% commission would earn approximately the same in the end as agents who stayed at Realty One or Smythe Cramer and re-

ceived half of the 50% commission that, under the traditional compensation formula, is split with the broker.

### C. Defendant Realty One's Counterclaims

Realty One has asserted in various counterclaims that the plaintiffs violated §§ 1 and 2 of the Sherman Act and state antitrust law (1) by agreeing to set the level of compensation that Re/Max brokers would pay to other brokers in cooperative transactions, (2) by agreeing not to recruit each other's agents, (3) by recruiting Realty One's agents with the deceptive promise of higher compensation, (4) by disparaging Realty One to its customers and to the general public, (5) by interfering with the contractual relationships between Realty One and its customers, and (6) by engaging in sham litigation for the sole purpose of hindering Realty One's operations. Realty One also alleged violations of Ohio law relating to (7) interference with business relationships and (8) unfair competition.

### D. The District Court's Pretrial Rulings

### 1. The Court's May 10, 1995 Opinion

On May 10, 1995, the district court entered an order dismissing three of Realty One's eight counterclaims. It reasoned as follows: First, Realty One did not have standing to pursue its claim that Re/Max franchisees illegally agreed not to recruit each other's agents ((2) above). In its claim, Realty One alleged no antitrust harm; in fact, it *benefitted* by the reduction in competition for remaining agents. Even if there were a harm to the market associated with this practice, it is primarily sales agents who would be harmed, and they would be the proper parties to bring suit, not Realty One.

Second, Realty One alleged no antitrust injury in its claim that Re/Max engaged in deceptive recruitment techniques ((3) above). The mere allegation that Re/Max

bid more for Realty One's agents could not constitute an antitrust violation.

Third, Realty One did not state a valid claim in arguing under § 2 of the Sherman Act that the Re/Max franchises conspired to set commission splits with non-Re/Max brokerages ((1) above), because Realty One alleged no specific intent on the part of Re/Max to monopolize. Realty One's allegations, even if true, evidenced no more than Re/Max's intent to expand into northern Ohio at Realty One's expense. Additionally, Realty One failed to make sufficient allegations that Re/Max's alleged vertical commission-setting agreements between the franchisor and the franchisees violated § 1, and thus the district court did not consider Realty One's conclusory amended complaint in that regard. However, the court *did find* that Realty One stated a valid § 1 claim that the franchises had conspired horizontally to set the commissions they pay to non-Re/Max brokerages in cooperative transactions.

Fourth, the court dismissed Realty One's antitrust disparagement claim ((4) above), because "[m]ere allegations of business disparagement are not the type of injuries to competition that the antitrust laws were designed to prevent."

Fifth, the court found that Realty One had stated a valid claim that the plaintiffs conspired to conduct sham litigation against Realty One in violation of § 1 of the Sherman Act ((6) above). Sixth, Realty One's state-law counterclaims contained allegations sufficient to survive a 12(b)(6) motion ((7) & (8) above).

Finally, regarding Re/Max's complaint, the district court discussed Re/Max International's, the franchisor's, standing to bring its antitrust claims. The court found that Re/Max International was indeed injured by the defendants' alleged anticompetitive conduct and was the proper party to assert the claim that the defendants were exercising monopoly power in the market for experienced real-estate agents. However, Re/Max International was *not* the proper party to prosecute the claim regarding the defendants' monopoly in the home-buying and selling market. Re/Max could not prosecute the *brokerage-services* claim because, as we shall discuss below, of the five factors enumerated by this court to be evaluated in determining antitrust standing, two weighed heavily against Re/Max International, one was neutral, and two weighed for the plaintiffs. On the other hand, the factors heavily favored standing on the *competition-for-agents* claim.

### 2. The Court's September 11, 1995 Opinion

On September 11, 1995, the district court denied another motion by Realty One asking for summary judgment. This time, the defendant claimed that issues decided in *Re/Max International, Inc. v. Donald Greif,* No. 90–0166 (N.D.Ohio Mar. 14, 1990), precluded Re/Max from arguing for a different result in the present case. For reasons not important to this appeal, the district court denied Realty One's motion. Realty One has abandoned any issue-preclusion assignment of error by failing to discuss it on appeal.

### 3. The Court's September 18, 1995 Opinion

Next, on September 18, the district court considered another round of the defendants' motions for summary judgment. This time, Realty One and Smythe Cramer contended that the four-year statute of limitations had run against many of the plaintiffs' claims, because the first act of the alleged conspiracy occurred in 1987. However, the district court found a genuine factual dispute whether the defendants had engaged in overt acts of conspiracy within the four years preceding January 1994, when the original complaint was filed. Specifically, the court noted record evidence tending to show that the defendants had instituted adverse commission splits against most of the plaintiffs *after*

January 1990, and that the defendants thereafter engaged in other acts such as disparagement of the plaintiffs and disruption of the plaintiffs' efforts to show and sell homes listed by the defendants. Additionally, the plaintiffs' monopolization claims under § 2 had not expired, because the defendants acquired competitors in markets in which they allegedly had monopoly power, thereby injuring the plaintiffs within the limitations period.

Finally, the district court held that even if the four-year limitations period would have otherwise expired, evidence that the defendants fraudulently concealed their illegal activities equitably tolled the running of the statute. The plaintiffs had introduced evidence that one or both of the defendants had (1) denied their collusion, (2) instructed employees not to discuss the adverse splits, (3) obscured their targeting of Re/Max by putting other companies on their adverse-splits list, (4) failed to keep records of meetings during which the decisions regarding adverse splits were made, and (5) altered documents submitted to the Federal Trade Commission pursuant to the agency's investigation of the adverse-splits policy. The court found that this concealment prevented the plaintiffs from discovering, with due diligence, evidence that the defendants had conspired to adopt the adverse-splits policy.

### 4. The Court's March 19, 1996 Opinion

On March 19, 1996, the district court granted summary judgment dismissing all of the plaintiffs' remaining claims, and four of Realty One's five remaining counter-claims.

The plaintiffs' § 2 monopolization claims were dismissed because the plaintiffs failed to meet their burden of defining the relevant geographic markets in which the defendants were alleged to wield monopoly power; nor had Re/Max met its burden of showing that the defendants had the power to set prices or exclude competition in the geographic markets plaintiffs claimed. First, the court rejected the plaintiffs'

claim that each of 161 cities and towns in northeast Ohio was its own geographic market for real-estate agents and for brokerage services. The plaintiffs had introduced no evidence that home buyers or sellers obtain real-estate brokerage services exclusively or even largely from brokers within their own political subdivisions. Similarly, no evidence indicated that brokers did not cross political boundaries to show homes, or that brokerages did not cross such boundaries to recruit agents.

Moreover, the district court held, even if the 161 areas were geographic markets, the plaintiffs' expert, Dr. Martin, relied on "questionable" data in reaching his conclusions that the defendants exercised monopoly power. In calculating market share, the expert looked only at the dollar value of homes sold, rather than the number of homes. He reviewed data from 1993 through 1995 only, although the plaintiffs' suit sought damages back to 1987. And, in his analysis, the expert may have overlooked up to 40% of all homes sold. Thus, the plaintiffs' expert's report did not sufficiently support the § 2 monopolization claims.

Second, even if the expert's conclusions were accepted, the plaintiffs had not met their "stiff burden" to establish monopolization, conspiracy to monopolize, or attempted monopolization. Particularly telling was the relatively low market share that the plaintiffs contended Realty One and Smythe Cramer had in the relevant localities—in no case was it above 51%. Although there is no minimum market share required to make out a § 2 claim, the court thought that failing to meet a 50–60% threshold defeats a claim unless evidence is proffered showing, for instance, that a defendant's market share increased after initiating the anticompetitive activity or that there were true entry barriers to the relevant industry. Similarly, the attempted monopolization claims failed because there was no evidence that there was a dangerous probability that defendants would succeed in achieving monopo-

lization—their market share had not grown since 1987, and new firms could enter the market easily to undercut monopolistic prices or policies. Likewise, the conspiracy-to-monopolize claims failed because the plaintiffs had offered no evidence of the defendants' specific intent to establish a monopoly.

The defendants were granted summary judgment on the plaintiffs' § 1 conspiracy claims, because there was insufficient evidence that the defendants *mutually agreed* to adopt adverse splits, rather than imposing them independently. The court recognized that a claim of conspiracy to fix prices need not include proof that the activity unreasonably restrains trade and that such an agreement if proven would be a *per se* violation of § 1 of the Sherman Act. However, in ruling against the plaintiffs, the court found that all of their proofs were equally consistent with independent action.

Most important to the court's analysis in this regard was its rejection of the findings of the plaintiffs' economic expert, Dr. Martin. Although the witness stated in his written report that unilateral imposition of adverse splits would be economically irrational, the district court held that Dr. Martin "implicitly" admitted in his deposition that independent adverse splits could have been in Smythe Cramer's (and thus Realty One's) best interest; that is, had Smythe Cramer not imposed the adverse splits, it would have lost agents to Re/Max or been forced to pay higher salaries. Although the court cited this economic benefit to the defendants of imposing the adverse-splits policy, notably, the court did not consider whether the plaintiffs' expert had admitted, implicitly or otherwise, that this benefit exceeded the *costs* of the policy in terms of lost business. Also, according to the court, the facts that the defendants imposed roughly the same splits at roughly the same times, that they exchanged information regarding their splits against Re/Max, and that they had opportunities to meet, could all be explained innocently.

Moreover, the court ruled that the testimony of Leo Lee—to the effect that Realty One's CEO admitted conspiring with Smythe Cramer to impose the adverse splits—was inadmissible. The court found the conversation between Lee and Realty One's CEO to be inadmissible hearsay, and not within the requirements of the coconspirator exclusion of Fed.R.Evid. 801(d)(2)(E), because there was insufficient evidence of a conspiracy and because the statement could not be construed as being "in furtherance of" the conspiracy even if one existed. The court apparently did not consider whether the statement was admissible against Realty One simply as an admission of a party opponent. Fed. R.Evid. 801(d)(2)(D).

The court also dismissed the plaintiffs' state-law claims for reasons that are not relevant here, as the plaintiffs have not appealed this aspect of the district court's judgment.

As for Realty One's remaining counterclaims, all were dismissed as unsupported by the evidence, save only the claim that the plaintiffs had engaged in sham litigation in violation of § 1. Although the court found evidence that Re/Max franchises had agreed to set broker-to-broker commission splits for non-Re/Max brokers, the court held that Realty One had not alleged a resulting injury to its business or property and thus had not stated a valid claim on that count. Realty One's tortious interference and unfair-competition claims—that the plaintiffs interfered with contractual relationships between Realty One and its agents and between Realty One and its customers listing homes for sale—were also dismissed. Re/Max could not illegally induce an at-will employee from leaving his position with Realty One, and Realty One had adduced no evidence of any customer contract with which any plaintiff had interfered. Lastly, Realty One's claim that the plaintiffs engaged in unfair competition by stealing lists of Realty One's agents failed, because there was no evidence that Ohio

regards a list of brokers as a "trade secret."

Because the central claims in the case had been dismissed, and because proceeding to trial on the sham-litigation claim would result in undue delay of the appeals from the several judgments as matters of law, the district court entered final judgment under Fed.R.Civ.P. 54(b). This timely appeal followed.

## II. STANDARD OF REVIEW

We review for abuse of discretion the district court's judgments of dismissal for failure to state a claim under Fed. R.Civ.P. 12(b)(6), and *de novo*, its dismissal of claims on summary judgment under Fed.R.Civ.P. 56.

## III. DISCUSSION

### A. Plaintiffs' § 1 Conspiracy Claims

As we have said, § 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1, prohibits any "contract, combination ..., or conspiracy" between two or more persons that unreasonably restrains trade in interstate commerce. *See Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Absent sufficient evidence that Realty One and Smythe Cramer *agreed* to adopt the adverse-splits policy, § 1 of the Sherman Act is not implicated. *See Nurse Midwifery Assocs. v. Hibbett,* 918 F.2d 605, 611 (6th Cir.1990). We turn, therefore, to a discussion of the evidence adduced regarding the defendants' alleged conspiracy.

### 1. Evidence of Conspiracy Between the Defendants

As in other areas of law, a conspiracy may be demonstrated by direct or circumstantial evidence. However, circumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct. In such a case, the evidence of conspiracy would not preponderate. *See Riverview Investments, Inc. v. Ottawa Community Improvement Corp.,* 899 F.2d 474, 483 (6th Cir.1990). In other words, circumstantial evidence must tend to exclude the possibility of independent conduct in order that an antitrust claim survive summary judgment. Important factors to evaluate in this analysis include: (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire. *See Wallace v. Bank of Bartlett,* 55 F.3d 1166, 1168 (6th Cir. 1995). Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct.

We are satisfied that the district court erred in finding that the plaintiffs had not adduced evidence of the defendants' alleged conspiracy, sufficient to resist summary judgment. Certainly, much of the plaintiffs' evidence is as consistent with independent conduct as with a conspiracy. The facts that the defendants had opportunities to conspire, that they imposed adverse splits at almost the same times and in almost the same manner, and that their principals had preexisting business relationships are all probably equally consistent with unilateral action. Arguably, *without more,* these facts would be insufficient to support an inference of a conspiracy. However, there is more. These facts are strongly bolstered by the additional circumstantial evidence that the adverse-splits policy would not have been in either defendant's *independent* economic interest, and by the statement of witness Lee that Realty One's CEO admitted entering into an agreement with Smythe Cramer. This additional evidence, taken together with the other circumstantial evidence of conspiratorial conduct, would entitle a reasonable jury to conclude that

Realty One and Smythe Cramer conspired to adopt adverse commission splits against Re/Max.

First and foremost, Dr. Martin's deposition and report establish a genuine issue of material fact whether unilateral imposition of adverse splits would have been economically rational for the defendants. The district court found that Dr. Martin had admitted in his deposition that the adverse-splits policy may have been in Smythe Cramer's best interest. However, we think this finding mischaracterizes Dr. Martin's testimony, and disregards the clear import of his report. What Dr. Martin acknowledged in his deposition is that Re/Max would have been more successful in recruiting Smythe Cramer's agents if the latter had not imposed adverse splits. However, that statement does not address the *costs* to Smythe Cramer of the adverse-splits policy. Dr. Martin testified that if Smythe Cramer had no assurance that Realty One would also adhere to adverse splits against Re/Max, the danger of unilateral imposition would have *outweighed* the potential loss of agents.

For example, a unilateral-splits policy against Re/Max adopted only by Smythe Cramer would keep Smythe Cramer's agents from leaving for *Re/Max*, but it would result in customers and sales agents leaving for *Realty One*. Dr. Martin clearly stated in different ways on a number of occasions that "without coordinated conduct, parallel imposition of adverse splits is implausible." He explained that, in a market with two dominant competitors, the risk of loss of sales agents to a third entrant offering more favorable employment terms is outweighed by the risk of loss of market share if a dominant competitor imposes adverse splits on the new market entrant. For example, one of two dominant competitors (Smythe Cramer) acting rationally will not independently impose adverse splits on a new competitor (Re/Max), because doing so will cause the new competitor to concentrate on supplying buyers to purchase properties listed by the other dominant competitor (Realty One). Thus, the dominant competitor who does not impose the adverse splits will sell more homes faster, while the other dominant competitor will lose agents and referral business in a downward cycle.

Furthermore, the best of both worlds for *either* dominant competitor is for the *other* to impose the adverse splits against the new entrant. In that situation, the non-imposing competitor obtains a "very high" increase in profits while the imposing competitor sinks to "very low." When both dominant competitors impose adverse splits, both increase their profits, but neither obtains a "very high" increase. Thus, even when one dominant competitor has already adopted adverse splits *on its own* (a "highly unlikely" event in the first place), the other dominant competitor has a strong incentive *not* to do likewise. Importantly, the defendants have not challenged Dr. Martin's qualifications or his data to support this analysis, but rather only his conclusions. Because his conclusions follow logically from his analysis, they cannot be rejected solely as a matter of law.

Dr. Martin's reasoned rejection of the defendants' proffered explanation for their common adverse-splits policy lends additional credence to the inference that Realty One's and Smythe Cramer's conduct was not independent. The defendants claim they were forced to impose adverse splits in order to recoup the costs they incurred in training new agents; Re/Max, on the other hand, incurs no such costs, but instead recruits experienced agents from other firms. To "level the playing field," the defendants were forced to penalize Re/Max for "appropriating" the value of their investments in their experienced agents.

Dr. Martin noted, however, that real-estate agents are usually at-will employees, and that the knowledge and skill they attain is easily transferrable to other firms. Thus, a real-estate agent could leave his brokerage at any time and take

all the value of his training with him. Therefore, he said, "investments and training undertaken by the real estate firm will be designed to allow for the ever present risk of agent turnover that may occur before a return can be realized." If the risk of agent turnover is incorporated into the agent's commission rate (*i.e.*, an inexperienced agent, in effect, "pays" for his training by receiving lower commissions), then a brokerage cannot lose its "incubation expenses" when an experienced agent leaves. Thus, according to Dr. Martin, the defendants' proffered explanation for their actions is pretextual.

Although there appears to be no unequivocal evidence that the defendants in fact pay their inexperienced and therefore less skilled agents less than their experienced agents (thereby placing the costs of training on the novice agent), neither has either defendant argued that it *does not* adhere to this practice. Moreover, common sense suggests that inexperienced agents earn less than experienced agents, because they are less skilled at "closing" sales. If, indeed, the defendants' agents "pay" for their own training while they are learning the trade by earning less, then the defendants suffer no loss of investment when their agents are successfully recruited by Re/Max. Instead, all Realty One and Smythe Cramer lose is that portion of their profit margin attributable to the departing-agent's sales. The fact that the defendants apparently do not enter into long-term contracts with their agents, or obtain covenants not to compete, indicates that they consider the risk of agent-investment loss to be minimal. The likelihood that adverse splits were against the defendants' interests absent a conspiracy to adopt them and that they offered an implausible explanation for the splits' adoption—both of which are sufficiently supported by the report and deposition of Dr. Martin—raise a genuine issue of material fact whether the defendants conspired.

■ Second, Lee's testimony is additional evidence of the defendants' conspiracy, and is admissible against Realty One. Lee stated in an affidavit and at his deposition that in a conversation with Aveni, the CEO of Realty One, Lee asked Aveni whether the common adverse-splits policy had antitrust implications. According to Lee, Aveni responded "that there was no need to worry because someone would have to prove" he spoke to L.B. McKelvey, the principal shareholder of Smythe Cramer. At that point Aveni "leaned forward, smiled and said 'of course we didn't.'" Lee's affidavit further states, "Although cast as a denial of any wrong doing [sic], the real thrust of Avenis [sic] response was as a non-verbal affirmation that an agreement had in fact been made." Quite aside from Lee's opinion as to the legal significance of Aveni's statement, we are satisfied that the district court mistakenly concluded that Lee's testimony concerning Aveni's words and gestures were inadmissible hearsay.

Considered separately, Aveni's oral utterances and his act of leaning forward and smiling have no incriminatory meaning. But, considered together, as the constituent parts of a single, unitary assertive statement, each part integral to the others, as Aveni obviously intended, the statement unmistakably conveys the idea that Aveni actually *had* "talked" to McKelvey, but that no one would be able to prove it. As we have said, the district court ruled that Aveni's communication was inadmissible hearsay as to both defendants, and was not made admissible as "not hearsay" under Fed.R.Evid. 801(d)(2)(E), because there was not sufficient evidence of a conspiracy, and even if there was, the statement did not further the conspiracy. We hold that the district court erred in excluding Lee's testimony as to Realty One. Even if Aveni's declaration was not admissible as a statement of a coconspirator under Fed. R.Evid. 801(d)(2)(E), we are satisfied that it is "not hearsay" under Fed.R.Evid. 801(d)(2)(D) and is admissible against Realty One as a "statement by the party's [ (Realty One) ] agent [ (Aveni) ] ... con-

cerning a matter within the scope of the agency or employment, made during the existence of the relationship." *Id.*

Of course, Aveni's communication to Lee would not be admissible against Smythe Cramer as an admission under Rule 801(d)(2)(D), because Aveni was not an agent of Smythe Cramer. The question remains, however, whether the statement was admissible against Smythe Cramer as the statement of a coconspirator under Rule 801(d)(2)(E). A statement is "not hearsay" if it is offered against a party—Smythe Cramer—and was made "by a coconspirator of a party"—Realty One—"during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). "A 'statement is "in furtherance of" a conspiracy if it is intended to promote the objectives of the conspiracy.' " *United States v. Monus,* 128 F.3d 376, 392 (6th Cir.1997). However, "[t]he statement need not actually advance the conspiracy to be admissible." *United States v. Clark,* 18 F.3d 1337, 1342 (6th Cir.1994).

Although the district court thought otherwise, we are satisfied, as we have said, that there was sufficient evidence of a conspiracy in the record, with or without Lee's testimony, to defeat summary judgment. Consequently, it follows that there is sufficient evidence of a conspiracy to meet that foundation requirement for the admissibility of Aveni's statement under Rule 801(d)(2)(E). In addition to the independent evidence of conspiracy we have already discussed, Aveni's statement itself could properly have been considered by the district court in making its Rule 104(a) determination concerning the admissibility of the statement as substantive evidence under Rule 801(d)(2)(E). *Bourjaily v. United States,* 483 U.S. 171, 180–81, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In all events, we have no doubt that to the extent proof of the existence of a conspiracy is a foundation fact that conditions the admissibility of Aveni's statement under Rule 801(d)(2)(E), the plaintiffs met their burden. That having been said, however, we cannot say that the district court clearly erred in excluding Aveni's statement on the ground that it was not in furtherance of the conspiracy.

The gist of Aveni's communication—that Realty One had in fact conspired with Smythe Cramer—could plausibly be interpreted as (1) asking for Lee's silence, (2) assuring him that he was not in danger, or (3) merely boasting. The first two interpretations might well have supported a conclusion that Aveni's statement furthered the conspiracy, but the third interpretation—merely boasting—surely would not. Since the first two interpretations are not clearly preferable to the third, and since we review the district court's Rule 104(a) ruling on this preliminary question of fact for clear error only, we are satisfied that the court's finding that Aveni's statement did not further the conspiracy was not clear error, and therefore the ruling vis-à-vis Smythe Cramer, must be upheld.

### 2. Illegality of the Conspiracy

Even when the existence of a conspiracy between antitrust defendants has been sufficiently established, normally a plaintiff in a § 1 claim still bears the burden of proving that the defendants' agreement unreasonably restrains trade. However, such proof is not necessary when

> the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (citation omitted). Generally speaking, group boycotts and refusals to deal are "so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* viola-

tions." *Id.* at 290, 105 S.Ct. 2613. However-er, as the Court stated in *FTC v. Indiana Federation of Dentists,* "the category of restraints classed as group boycotts is not to be expanded indiscriminately." 476 U.S. 447, 458, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986).

 If an antitrust defendant's conduct cannot reasonably be justified as pro-competitive—viewing the facts in the light most favorable to the plaintiff according to the summary-judgment standard—then a *per se* analysis is appropriate. As the Supreme Court has stated, "A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." *Northwest Wholesale Stationers,* 472 U.S. at 298, 105 S.Ct. 2613.

In *Northwest Wholesale Stationers,* defendant Northwest's expulsion of Pacific Stationery from a wholesale cooperative was *not* likely to result in predominantly anticompetitive effects because Northwest did not possess market power or exclusive access to an element essential to effective competition. *Id.* at 296, 298, 105 S.Ct. 2613. The Court did note, though, that a concerted refusal to deal "might justify *per se* invalidation if it placed a competing firm at a severe competitive disadvantage." *Id.* at 295 n. 6, 105 S.Ct. 2613.

On the other hand, in *FTC v. Superior Court Trial Lawyers Association,* 493 U.S. 411, 422–23, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), the Court found *per se* illegal an agreement, entered into by many private lawyers who regularly represented indigent criminal defendants, to refuse assignments from the court until the District of Columbia raised their rate of compensation. Notably, the Court did not consider whether the attorneys who had agreed to the boycott in fact exercised market power. Their horizontal refusal-to-deal agreement alone "unquestionably" constituted a "naked restraint on price and output." *Id.* at 423, 110 S.Ct. 768 (internal quotation marks omitted).

While the *Northwest Wholesale Stationers* and *Superior Court Trial Lawyers* cases provide a framework for the analysis of the present case, *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), is particularly instructive. *Indiana Federation* makes clear that, although the "rule of reason"—which requires proof of unreasonable restraint of trade—and *per se* analysis are often discussed as if they are dichotomous, the practical difference between these two analytical tools is sometimes negligible. In *Indiana Federation,* a group of dentists conspired to deny insurance companies' requests for x-rays that the insurers needed in order to determine the necessity for dental procedures performed on their insureds. *Id.* at 451, 106 S.Ct. 2009. The Court viewed the dentists' refusal as a group boycott, even though the group did allow the insurance companies to review the x-rays at the dentists' offices. In essence, the imposition of the additional cost of traveling to the dentists' offices made the dentists' conduct a refusal to deal. However, the Court did not find the refusal to deal was a *per se* violation because *Indiana Federation* differed from the paradigmatic *per se* case "in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *Id.* at 458, 106 S.Ct. 2009. Apparently, *Indiana Federation* was not such a case because the boycott did not have the purpose of discouraging the dentists' customers from doing business with competitors. Thus, the Court required proof that the boycott unreasonably restrained trade.

Even though the Court applied the rule of reason, it summarily concluded that the insurance companies had met their burden of proving an unreasonable restraint of trade:

A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the

market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them. Absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services—such an agreement limiting consumer choice by impeding the "ordinary give and take of the market place" cannot be sustained under the Rule of Reason.

*Id.* at 459, 106 S.Ct. 2009 (citations omitted).

Notably, the Court rejected the dentists' argument that the rule-of-reason analysis must fail because the relevant market had not been defined and the Federation's market power not proven. *Id.* at 460, 106 S.Ct. 2009. According to the Court, even if the Federation's boycott was not sufficiently "naked" to require it to come forward with some procompetitive justification, sufficient proof of the boycott's actual detrimental effects obviated the need for detailed market analysis. *Id.* at 460–61, 106 S.Ct. 2009. In that case, the FTC had found that in the communities of Anderson and Lafayette, Indiana, the Federation had obtained the cooperation of "heavy majorities" of dentists and had effectively thwarted insurers' requests for x-rays in those areas. These findings of detrimental effects, *"viewed in light of the reality that markets for dental services tend to be relatively localized,"* were "legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." *Id.* at 461, 106 S.Ct. 2009 (emphasis added). Moreover, the proof that insurers' requests had been effectively denied was sufficient to support the unreasonable-restraint finding, even absent any proof that the dentists' refusal to deal resulted in higher prices for consumers. *Id.* Thus:

A concerted and effective effort to withhold (or make more costly) information desired by consumers for the purpose of

determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher priced services, than would occur in its absence.

*Id.* at 461–62, 106 S.Ct. 2009.

Here, in applying *per se* analysis, the district court characterized Realty One's and Smythe Cramer's adverse-splits policy as price-fixing. However, we conclude that the practice is more akin to a refusal to deal. The defendants did not conspire to set the commission fee charged to home-buying and selling consumers for the agents' services. Neither did they agree to pay their agents the same dollar amount or even to adopt the same agent-brokerage commission split. Instead, the defendants agreed to adopt the same broker-broker commission split on every transaction in which a *Re/Max* agent represented the buyer.

In essence, this is a refusal to deal. Like the dentists in *Indiana Federation,* Realty One and Smythe Cramer did not completely shut out the boycotted entity, but they did impose additional costs on the boycott victims. In the case of the dentists, this was accomplished by making the insurance companies come to the dentists' offices to review dental records; in the case of Realty One and Smythe Cramer, it was accomplished by reducing the compensation of any agent who defected to a Re/Max franchise, thereby making Re/Max pay even more to its agents if it wanted to keep them. Individually, the defendants *admitted that their intent* in adopting the adverse-splits policy was to prevent their agents from joining Re/Max. Thus, Re/Max has been forced to pay an even higher premium to obtain the information and experience held by the defendants' agents. Re/Max alleges that the higher premium is economically unsustainable, and has forced

some franchises to close and prevented others from opening.

Of course, just because Re/Max is harmed does not necessarily mean that the public is also adversely affected by the defendants' practice. If Re/Max "loses" because its system is less efficient, then its injury is not actionable. However, if the Re/Max system provides a benefit to consumers, and if Re/Max's losses are due to the defendants' use of market power to prevent a more-efficient competitor from establishing itself, then an antitrust violation is made out.

■ The record contains sufficient evidence for a reasonable jury to conclude that the Re/Max 100% Concept enhances efficiency and provides a benefit to the public, and that the likely· effect of the defendants' conduct was primarily anti-competitive. That is, Re/Max has provided sufficient evidence that its 100% Concept compensates successful agents at a greater rate than the traditional $^{50}\!/\!_0$ agent-brokerage split the defendants use. If this evidence is credited, then Re/Max will attract the most successful agents in the area served by one of its franchises if the market is truly free.

This concentration of top agents in one place would have several potential advantages for home buyers and sellers. First, because these agents are by definition the most efficient, they very likely require less administrative support per dollar of revenue. In a competitive market, Re/Max would be forced to pass along some of this savings to clients. Second, since the 100% Concept has been implemented nationwide, consumers can count on highly skilled, experienced Re/Max agents no matter where they seek to buy or sell a home. Such consumers may avoid having to gather information in order to locate competent agents and may rely on Re/Max's reputation for hiring only the best agents, thereby saving valuable time. Third, consumers save time in the buying and selling process when an experienced agent more quickly understands their needs and does

not match them up with unsuitable prospects. In sum, a jury could find from the evidence that the Re/Max system directly and indirectly lowers the cost and improves the quality of brokerage services offered to the public.

The response the defendants offer to these suggested advantages that can be realized when doing business with a Re/Max broker is not persuasive. To reiterate, the defendants offer two justifications (defenses) for their imposition of the adverse-splits policy: First, that they are merely protecting their investments in their experienced agents; second, that they are fending off an attempt by Re/Max to use its national economic resources to *overpay* experienced northeast Ohio agents until Re/Max has established its own monopoly in the market for such agents and driven the defendants out of business. As for the first of these, if the defendants have any investment in their novice agents, they can protect that investment by, for instance, signing agents to long-term contracts or obtaining covenants not to compete. Of course, either of these options would increase costs by providing job security to potentially unproductive agents or by paying additional compensation in exchange for a noncompetition covenant. If Re/Max can economically offer greater compensation than the defendants provide, then by definition either the Re/Max system is an efficiency-increasing innovation or the defendants are reaping monopolistic profits, or both. On the other hand, if Re/Max cannot economically offer greater compensation, but is doing so only temporarily and absorbing the loss through its national resources in order to obtain a monopoly in northeast Ohio, then not only must Re/Max lose on its own claims, but Realty One's counterclaims must be sustained. This is the fulcrum on which this case turns.

We reject, as a matter of logic and law, the suggestion that Re/Max is transferring resources into northeast Ohio in order to offer experienced agents there economical-

ly irrational compensation through Re/Max's 100% Concept. Simply put, this is impossible. There is no dispute that Re/Max requires all its franchises to adhere to the 100% Concept. Thus, if the concept were economically unsustainable in northeast Ohio, it would not be sustainable anywhere, and certainly would not be capable of supporting a national network of franchises *and* a money-losing effort in northeast Ohio.

Therefore, viewing the disputed facts in the light most favorable to Re/Max, as we must, and rejecting the defendants' justifications as a matter of law because no reasonable jury could believe them, we conclude that the plaintiffs have adduced sufficient evidence to resist summary judgment on its claim that the defendants conspired to unreasonably restrain trade in violation of § 1 of the Sherman Act.

### B. Plaintiffs' § 2 Monopolization Claims

Some plaintiffs' § 2 claims were also erroneously dismissed on summary judgment. Although the district court correctly concluded that Re/Max failed to define the relevant geographic markets, the court erroneously rejected evidence tending to show that the defendants had the ability to exclude competition. For instance, Re/Max presented evidence showing that the adverse-splits policy has prevented new Re/Max franchises from forming and may have driven several franchises out of business. Additionally, there is evidence that adopting adverse splits without market power is economically irrational, and that doing so has failed elsewhere. Because these factors raise genuine issues of material fact, summary judgment against Re/Max on the § 2 monopolization claims was inappropriate.

 The offense of monopolization under § 2 has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

 There are two ways to establish the first element, that is, that the defendant holds monopoly power. The first is by presenting direct evidence "showing the exercise of actual control over prices or the actual exclusion of competitors." *Byars v. Bluff City News Co.,* 609 F.2d 843, 850 (6th Cir.1979). The second is by presenting circumstantial evidence of monopoly power by showing a high market share within a defined market. *See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 196–97 (1st Cir.1996); *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995). In recent years, parties and courts have increasingly moved toward utilizing the circumstantial method as a "shortcut." However, this does not undercut the continued viability of the first avenue of establishing monopoly power. For the reasons below, we find that although the plaintiffs failed to define the relevant market with precision and therefore failed to establish the defendants' monopoly power through circumstantial evidence, there does exist a genuine issue of material fact as to whether the plaintiffs' evidence shows direct evidence of a monopoly, that is, actual control over prices or actual exclusion of competitors. A geographic market is defined as an " 'area of effective competition.' " *Moore v. Matthews & Co.,* 550 F.2d 1207, 1218 (9th Cir.1977) (citation omitted). Although such an area is not subject to definition by metes and bounds, *see White & White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495, 503 (6th Cir.1983), it is the locale in which consumers of a product or service can turn for alternative sources of supply, *see Moore,* 550 F.2d at 1218. Obviously, at the outer edges of a *bona fide* geographic market, buyers may be able to cross into other territory for their supply of a prod-

uct or service; however, this fact alone does not require a rejection of the claimed market. *See United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 359–60, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). On the other hand, when the evidence indicates that a large proportion of consumers within the proposed area in fact turn to alternative sources of supply outside the proposed area, the market boundaries posited by the plaintiff must be rejected. *See Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 346 (8th Cir.1995). Dr. Martin in his report devoted 16 pages to defining the relevant geographic markets. He concluded that each of the 161 municipalities and townships in northeast Ohio as listed on the relevant multilisting service (MLS) was its own market for brokerage services and for real-estate agents. As support, Dr. Martin noted the following: there are few economies of scale in consolidating many agents into one office covering more geographical area; at least one study has shown that 70% of home sales occur within five miles of the listing-agent's office; franchise operators frequently limit their franchisees' territory to a one-mile radius around the franchise office; and franchisors expanding into new territory do so by acquiring existing brokerages because they regard as critical the local knowledge possessed by local agents. Furthermore, the plaintiffs' expert noted that market-share data are tracked community by community, and the MLS data are also broken down that way because the information is only useful community by community.

Relying on statements of the principals of Realty One and Smythe Cramer, Dr. Martin testified, in essence, that real-estate agents possess knowledge specific to the communities in which they operate and do not compete for buyers or sellers outside their communities. For the same reasons, brokerages compete for experienced agents only within their respective communities, because an agent's experience in another community is much less valuable.

But none of this comes close to establishing that each political subdivision in northeast Ohio constitutes a separate area of effective competition. Although Dr. Martin's report establishes that agents' knowledge is restricted to a relatively small area, there is almost no evidence that the small geographic area in which an agent has expertise coincides with the corporate or geographic limits of the city or town in which that agent operates. It is not only conceivable, it is almost inescapable, that agents and consumers located close to boundary lines will cross over to adjacent cities and towns to provide and to seek brokerage services. Indeed, the evidence indicates that some Re/Max agents do business in more than one city or town.

It is highly likely that Realty One and Smythe Cramer agents also service more than one political area. It is also highly likely, and what is more important is that there is no evidence to the contrary, that persons looking to buy houses will not restrict their searches to homes within a particular city or town, especially when the relevant characteristics of adjacent municipalities are largely indistinguishable, as is often the case in suburban communities. The fact that Smythe Cramer and Realty One have offices in only 34 and 41, respectively, of northeast Ohio's 161 cities and towns strongly suggests that the relevant geographic markets in this region consist of more than one political subdivision.

We recognize, of course, that no real-estate market is airtight. There will always be persons from outside a geographic market seeking to buy a home inside the market, and there will always be persons looking at potential homes in two adjacent markets. Nevertheless, we believe that a relevant geographic market for real-estate brokerage services and agents can and must be proved to a greater degree of specificity than the plaintiffs have done here. Re/Max has shown to our satisfaction that such geographic markets are relatively small, but their argument that the boundaries of these markets correspond

with city or town lines is almost completely arbitrary. There is no evidence, for instance, regarding the percentage of homes sold by particular agents in particular cities. If Re/Max's market definition were accurate, one would expect that agents serving a particular city would receive close to 100% of their commissions from sales within that city, and similarly, that individuals seeking to sell their homes would seek out agents within their local boundaries. However, there is no evidence in the record that this is the case. Thus, we think, plaintiffs have failed to adduce sufficient evidence that each city and town in northeast Ohio is a separate area of competition for valuable real-estate information.

Alternatively, Re/Max argues that it need not define the relevant geographic markets for § 2 purposes if it can show the defendants have actually succeeded in setting prices or excluding competition. The plaintiffs point to evidence that sales commissions are higher and less negotiable in northeast Ohio than elsewhere in the U.S.; that Realty One has admitted being able to charge high rates in the western Cleveland suburbs because of its market dominance there; and that both defendants have been successful in imposing adverse commission splits which would be economically impossible to do without monopoly power.

■ We agree that an antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition. This court recognized such a rule in *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir.1979) (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)). In *Byars*, the plaintiff received periodicals from a regional distributor and distributed them to small retailers in exchange for 10% of sales. Eventually, the regional distributor decided to refuse to deal with the plaintiff—who

this court deemed an independent contractor—and began distributing the periodicals to the small retailers directly. *Id.* at 848.

Although the district court found no § 2 violation, this court remanded for "fresh fact-finding" and directed the district court to consider not only the defendant's market share, but also whether the customers for which the parties were competing received "inferior service at greater cost" once the defendant prevented the plaintiff from servicing the small retailers and left the latter no alternative source of supply. *Id.* at 852, 853 n. 26. If the evidence that the retailers received less service at greater cost was credited by the district court, it "lends strong support to plaintiff's contention that [the defendant] possesses monopoly power." *Id.* at 853 n. 26. As we stated: "[T]he simplest way of showing monopoly power is to marshal evidence showing the exercise of actual control over prices or the actual exclusion of competitors." *Id.* at 850.

This view has been adopted, at least implicitly, in four sister circuits: the First, Eighth, Ninth, and Tenth. *See, e.g., Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196–97 (1st Cir.), *cert. denied,* 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995); *Flegel v. Christian Hosp.*, 4 F.3d 682, 688 (8th Cir.1993); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 966–67 (10th Cir.1990). As the Eighth Circuit has stated:

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects."

*Flegel,* 4 F.3d at 688 (quoting *Indiana Fed'n,* 476 U.S. at 461, 106 S.Ct. 2009).

Other circuits also look to evidence of actual detrimental effects in the absence of market definition and market share, but require unambiguous evidence that a defendant can control prices or exclude competition. *See, e.g., Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,* 65 F.3d 1406, 1412 (7th Cir.1995); *United States Football League v. National Football League,* 842 F.2d 1335, 1362 (2d Cir. 1988). On the other hand, the Fifth Circuit has rejected a plaintiff's claim in light of the defendant's low market share even though there was evidence of control over prices. *See Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.,* 679 F.2d 516, 526 (5th Cir.1982).

The Supreme Court has noted on at least two occasions that direct evidence of monopoly power will support an antitrust claim. *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 477, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Indiana Fed'n,* 476 U.S. at 460–61, 106 S.Ct. 2009. In *Eastman Kodak,* Kodak was accused of "tying" the sale of one product to the purchase of a separate product from Kodak, in violation of § 1. After the Court found sufficient evidence that Kodak had in fact tied the two products, it turned to the next question: whether Kodak had the power to raise prices and restrict output in the market for the secondary product. *See* 504 U.S. at 464, 112 S.Ct. 2072. Because evidence existed that Kodak had increased prices and excluded competition in the market for the secondary product, it bore the "substantial burden" of proving that it did not, in fact, possess monopoly power. *Id.* at 469, 112 S.Ct. 2072. Similarly, the *Indiana Federation* Court rejected defendant Federation's contention that the lack of proof regarding the relevant market required summary judgment in its favor. 476 U.S. at 460, 106 S.Ct. 2009. Instead, the Court looked to evidence that the Federation had actually defeated insurance companies' requests to view insureds' x-rays in holding that detailed market analysis was not required. *Id.* at 461, 106 S.Ct.

2009. As the *Indiana Federation* Court noted:

> [T]he finding of actual, sustained adverse effects on competition in those areas where [Federation] dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.

*Id.* The defendants contend that these cases are inapposite because they do not discuss § 2. However, we see no reason to believe that monopoly power in the § 1 context is any different from the § 2 monopoly power the plaintiffs allege here.

■ Similarly, there is sufficient evidence in this case to permit a jury to conclude that markets for real-estate brokerage services are relatively localized, even if they are larger than those the plaintiffs posit, and that there have been actual, sustained adverse effects on competition in those areas where one defendant or both predominate. Therefore, the plaintiffs have sustained their burden at this stage of proceedings despite the lack of reasonable and detailed market analysis.

Of course, the defendants also challenge the plaintiffs' factual claim that the defendants have actually exercised monopoly control. First, the defendants reject both the basis and the relevance of the conclusion that northeast Ohio sales commission rates are higher than in other comparable metropolitan areas. As for the basis, defendants argue that: (a) the study in question reviewed data for 1991 only, when the relevant time period here is 1987 to 1995; (b) there is no evidence that the rates charged by the defendants are not economically justified; (c) there is no evidence that commission rates are high in individual markets, as opposed to the whole northeast Ohio region; (d) there is no evidence that either of the defendants charges a lower rate in those areas where Re/Max

admits neither defendant has a monopoly; and (e) Re/Max agents usually charge the same rates as the defendants' agents. As for the relevance of the challenged conclusion, the defendants argue that even if a defendant's rates are higher than the norm, this does not demonstrate that a defendant has the power to set them, as opposed to being able to charge more for better service.

Second, the defendants deny that their ability to impose adverse commission splits demonstrates monopoly power. They argue that many Re/Max franchises have opened *after* the imposition of adverse splits, thus showing that the splits policy cannot exclude competition. Neither, they claim, does the policy have any effect on consumers, in light of the fact that the splits are aimed against agents and in the absence of evidence that rates paid by clients have risen since the policy was adopted. Interestingly, Realty One indicates that it has not excluded competition because the adverse-splits policy was *unsuccessful* in preventing agents from defecting to Re/Max.

We agree, for the reasons stated by the defendants, that Re/Max's argument regarding the 1991 survey may be rejected out of hand. But, the plaintiffs' other argument—that the defendants' ability to impose adverse splits demonstrates their monopoly power—is considerably more plausible. Obviously, if a monopolist successfully uses its power to prevent competition from ever entering the marketplace, the losing competitor's antitrust claim should not be dismissed simply because the monopolist's prices remained constant, because the plaintiff cannot show it was ever established in the market, or because the plaintiff was able to survive for a period before being forced to terminate operations. In any of these situations, consumers would be harmed if the new competitor offered better service at the same price as the monopolist, but was defeated because of the monopolist's refusal to deal. As we have discussed, Re/Max has made out a

justiciable case, at least for purposes of resisting summary judgment, that its system provides better service to real-estate consumers. Thus, if the evidence, viewed in the light most favorable to Re/Max, clearly demonstrates the defendants' ability to exclude Re/Max from the marketplace, summary judgment should not have been entered for the defendants.

There is evidence that several potential Re/Max franchisees declined to purchase franchises once they learned of the adverse-splits policy, and that at least eight franchises and the regional subfranchisor have gone out of business. Additionally, the report of the plaintiffs' expert clearly demonstrates that all of the plaintiffs lost considerable sums as the result of the defendants' practices. This is because experienced agents have been reluctant or unwilling to join Re/Max in light of the threat of adverse commission splits.

It appears that adverse-splits policies have failed when attempted in other markets. This fact, when combined with the evidence that such policies are economically irrational absent market dominance, strongly suggests that the defendants' ability to sustain adverse splits for more than ten years arises from monopoly power, whether exercised individually or collectively. Although the issue is close, we find that Re/Max has presented evidence sufficient to permit a jury to conclude that the defendants possess the ability to exclude competition in the residential real-estate markets comprising northeast Ohio.

■ Of course, the evidence supporting Re/Max's claim that the defendants have monopoly power cuts against its theories of attempted monopolization and conspiracy to monopolize. That is so because there is evidence indicating that adverse-splits policies work only when the imposer already exercises monopoly power. The report of the plaintiffs' expert effectively concludes that any attempt or conspiracy to achieve a monopoly *through* imposing adverse splits would be doomed to failure. The fact that the policy has been effective

demonstrates, according to the plaintiffs' own theory, that defendants already exercise monopoly power, and perforce, defeats the plaintiffs' additional claim that the defendants attempted or conspired to obtain a monopoly. Therefore, no reasonable jury could find that either defendant has attempted or conspired to monopolize.

## C. Statute–of–Limitations Defense

■ The statute of limitations for federal antitrust actions is four years from the accrual of the action. 15 U.S.C. § 15b. A cause of action accrues when a defendant commits an act that injures the plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Courts look to a defendant's overt acts, rather than the effects of those acts. *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir.1990). The district court held that no plaintiff's § 1 conspiracy claim is barred, because the plaintiffs produced evidence that the defendants fraudulently concealed evidence of their agreement to impose adverse splits against Re/Max.

■ The defendants argue that their splits policy was promulgated in 1987, therefore putting the plaintiffs on notice as of that date. But that is beside the point, at least as to the conspiracy issue. The plaintiffs could not have proceeded with their conspiracy claims without some evidence of a conspiracy between the defendants. Mere suspicion of a conspiracy is not enough, and certainly mere knowledge of the adverse-splits policy, without evidence that the defendants acted in concert, is insufficient. Further, there appears to be no dispute that the first hard evidence of a conspiracy was the Lee affidavit obtained by the plaintiffs in 1992. Thus, at least as to the § 1 conspiracy claims, the defendants' statute-of-limitations defense must fail.

■ However, the defendants are correct that most of the plaintiffs' § 2 monopolization claims are barred. Although the district court ruled otherwise on this issue, its ruling rested on the ground that Smythe Cramer had acquired another real-estate brokerage in one of the allegedly monopolized markets in 1992 or 1993. However, as we have indicated, the monopolization claims here relate to the defendants' use of adverse commission splits. Smythe Cramer's accumulation of additional market share through acquisitions may be evidence of its monopoly power, but the injury to the plaintiffs' businesses is the adoption of the adverse-splits policy in 1987. It appears that plaintiffs Re/Max International, Re/Max Key Realty, Re/Max Property Professionals, Re/Max Northeast Ohio, Re/Max Realty Properties, True Independence Partnership, and R.E.P. all had notice of the defendants' adverse-splits policy prior to 1990. Therefore, those plaintiffs' § 2 claims are time-barred. Plaintiffs Re/Max Crossroads, Re/Max Affinity, Re/Max Results, Re/Max Xpress, and Zames Realty, however, do not appear to have received notices until after 1990, and their claims are not barred.

## D. Standing Defense

The defendants also maintain that the franchisor and subfranchisor plaintiffs lack standing to bring antitrust claims because Re/Max International and Re/Max Northeast Ohio can show no antitrust injury and are not the appropriate parties to bring these causes of action. We disagree.

The question of the franchisor-plaintiffs' standing may be resolved by reference to *Associated General Contractors of California, Inc. v. California State Council of Carpenters (AGC)*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), and to *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983).

Although a discussion of these cases will necessarily extend this already extensive opinion, we think they provide a useful background for our conclusion concerning the sometimes abstruse standing doctrine. In *AGC*, a union sued an association of employers, claiming that the association

coerced its members and other employers to enter into business relationships with nonunion firms. The union alleged that this coercion diverted business opportunities from unionized firms, and thereby adversely affected the union itself. 459 U.S. at 520, 103 S.Ct. 897. The Court rejected the union's claim to standing on several grounds. First, although the union alleged a causal connection between the antitrust violation and the harm the union suffered, and also that the defendants intended to cause that harm, the Court held that the injury was not the type that the Sherman Act was meant to prevent because labor-relations issues fall under "a separate body of labor law specifically designed to protect and encourage the organizational and representational activities of labor unions." *Id.* at 540, 103 S.Ct. 897.

Second, the Court said, the injury to the union was speculative and indirect: the union had alleged only unspecified injuries to its "business activities," and the injuries were derivative of the injuries to the unionized contractors who lost jobs to nonunion firms. *Id.* at 541, 103 S.Ct. 897. If either the unionized association-member firms or the other coerced employers had suffered an injury attributable to the antitrust violation, they would have a valid antitrust cause of action. However,

> [t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general. Denying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied.

*Id.* at 542, 103 S.Ct. 897. The speculative nature of the injury was confirmed by the lack of any allegation that the share of the contracting market controlled by unions had decreased, that the number of union members had declined, or that the union's

dues or initiation fees had decreased. Moreover, there was no allegation that any employer was prevented from hiring a unionized contractor, as opposed to being forced to hire certain nonunionized firms. *Id.*

Third, the difficulty in computing damages if the union were granted standing stood as a final barrier to the union's claim. If the union had standing, the trial court would potentially face the daunting task of determining to what extent business was diverted from unionized contractors; identifying the union's damages; and apportioning damages among directly injured contractors, unions, and union employees. *Id.* at 545, 103 S.Ct. 897.

In *Southaven,* we summarized *AGC's* test for antitrust standing as consisting of five factors:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

715 F.2d at 1085. In that case, the owner-lessor of retail commercial space, plaintiff Southaven, rented space for a grocery store to a wholesale-retail food, drug, and sundries merchant, defendant Malone. Malone, in turn, rented the space to a subtenant grocery store. *Id.* at 1080. When the subtenant declared bankruptcy, Southaven and Malone reached an agreement regarding the vacant space which released Malone from its obligations at the site in exchange for Southaven's resumed control of the site and the equipment therein. However, when Malone discovered that Southaven was going to lease the space to a competing grocery store, Ma-

lone rescinded the agreement, allegedly in order to preserve its monopoly in area grocery stores. *Id.* at 1081.

We held that Southaven did not have antitrust standing under the five-factor test. Although Southaven had alleged a causal connection between its injury and an antitrust violation and that Malone intended the harm, Southaven was not a competing grocery store and thus was not a customer or participant in the relevant market. *Id.* at 1086. Therefore, its injury was an indirect by-product of the anticompetitive conduct, and not "inextricably intertwined" with an injury to the relevant market. *Id.* at 1086–87. Additionally, grocery consumers and other grocery stores would have been better plaintiffs. Moreover, Southaven had alleged no direct injury: it had not lost any income from the property, either through Malone's default or an increase in rent promised by the new tenant. Read liberally, Southaven's claim for damages rested on the premise that it could charge more to tenants in a development that included a grocery store. We held that this was too speculative. *Id.* at 1088.

▮ Here, however, the franchisor-plaintiffs have standing to pursue their claims. First, they have provided sufficient evidence that they suffered an antitrust injury caused by the defendants' anticompetitive conduct. Through the implementation of adverse splits, the defendants prevented Re/Max agents from earning their normal commission on most transactions, which in turn prevented Re/Max's 100% Concept from functioning, which prevented Re/Max from attracting top agents, which prevented Re/Max franchises from succeeding, which prevented Re/Max from earning revenue from those franchises and agents and from opening new franchises. While this chain of causation may be long, it is direct and unbroken.

Second, Re/Max's injury is of the type sought to be redressed by antitrust law. As we have indicated, sufficient evidence exists to conclude that adverse commission splits are anticompetitive. The defendants admit they intended to thwart, through the implementation of adverse splits, Re/Max's attempt to recruit defendants' agents. Although the policy was aimed more directly at Re/Max franchises, the effect was to deter agents from defecting to Re/Max, thereby impeding an innovative competitor's access to the market. Unlike in *AGC*, here, denying the franchisors standing would result in antitrust violations going "undetected or unremedied," if in fact Re/Max franchises were barred from northeast Ohio markets.

Third, the franchisors' damages are not speculative. Their expert has sufficiently broken down lost revenue by year and by category, comparing the 100% Concept's lack of success in northeast Ohio with the pattern of marked growth seen in comparable areas where established brokerages have competed for experienced agents by raising their compensation, rather than implementing adverse commission splits. Certainly, the precision of these calculations is subject to question; however, unlike in *AGC* and *Southaven*, here there is concrete and measurable evidence of direct damages.

Fourth and fifth, there is evidence that the more direct victims of the defendants' alleged conspiracy are the Re/Max franchises, and their existence complicates the calculation and apportionment of damages. Thus, we hold that the franchisors may not include in their claim for damages management fees, commissions, franchise fees, or renewal fees that were lost because of the effect of the adverse-splits policy on existing Re/Max franchises. If, upon remand, the Re/Max franchise-plaintiffs are successful in showing the defendants' liability, the franchises should be fully compensated for any lost earnings they can prove. Once these franchises are made whole, the franchisor-plaintiffs will then be due their portion.

## IV. REALTY ONE'S COUNTERCLAIMS

Realty One maintains that the district court erroneously dismissed five of its

counterclaims. To reiterate, Realty One has charged Re/Max with (1) conspiring to monopolize the northeast Ohio real-estate market by "combin[ing] their financial and other resources to work unlawfully in concert against local real estate brokers," (2) conspiring to unreasonably restrain trade by agreeing not to recruit other Re/Max agents, (3) conspiring to offer $^5$‰ commission splits in cooperative transactions with other brokerages, (4) interfering in Realty One's business relationships with its customers and agents in violation of Ohio state law, and (5) engaging in unfair competition by bringing sham litigation, also in violation of Ohio law.

### A. Realty One's §§ 1 and 2 Antitrust Counterclaims

Certainly, the district court's rulings dismissing Realty One's three antitrust issues, (1), (2), and (3) above, must be affirmed. First, the district court dismissed the conspiracy to monopolize claim because Realty One had failed to define the relevant geographic markets. In the district court, Realty One relied on the same market definition used by Re/Max. Its argument on appeal is that, if the markets defined by Re/Max are valid for Re/Max's § 2 claims, they must be valid for Realty One's counterclaims. However, we have found that Re/Max had failed to meet its burden in this regard, which correspondingly precludes Realty One's § 2 counterclaim. Unlike Re/Max, Realty One has not alleged or shown any actual effect on prices or competition resulting from Re/Max's alleged anticompetitive conduct that would save Realty One's failure to define the geographic markets.

 Second, the district court dismissed Realty One's claim that Re/Max franchises had illegally agreed not to recruit each other's agents, reasoning that Realty One had not sustained an antitrust injury from this conduct. We agree. Even assuming, as we must, that Re/Max did so conspire, the conspiracy would have no anticompetitive effect on Realty One's

ability to retain and recruit successful agents. In particular, Realty One alleges that Re/Max franchises conspired to set the commissions for its agents at 95 to 100%, and that they agreed to target only non-Re/Max agents for recruitment. Absent an allegation that Re/Max has market dominance, the only possible way that these conspiracies could have an unreasonable effect on commerce is if the national Re/Max network shifted resources into northeast Ohio to absorb a short-term loss so that Re/Max could gain a long-term monopoly. However, as we have said, this theory is logically flawed: Re/Max's 100% Concept is required of all franchises throughout the country; if it were economically unfeasible, there would be no national network from which to draw.

What remains of Realty One's counterclaim does not state an antitrust violation regarding the supply or the demand for agents. As for demand, Realty One's argument is inherently contradictory. On the one hand, Realty One maintains that Re/Max entices Realty One's agents with the promise, whether accurate or not, of higher compensation. This would increase demand for agents. On the other hand, Realty One contends that Re/Max agrees to limit intra-Re/Max competition, thereby *depressing* demand for experienced agents. If Re/Max has increased demand, there is no antitrust injury because increased competition does not offend the antitrust laws. If Re/Max has decreased demand, then Realty One is benefitted and has sustained no injury at all.

Realty One also seems to argue that Re/Max's conspiracy decreases agent supply. However, while Re/Max franchises may have intentionally reduced the pool of agents that they will recruit, nothing prevents Realty One from recruiting any agent in the market. In other words, nothing Re/Max does, save offering seemingly greater compensation for successful agents, hinders Realty One from retaining its own agents or obtaining new agents from other brokerages.

■ Third, Realty One's final antitrust counterclaim—that Re/Max franchises conspired with each other and with the franchisors to set cooperative commission rates at 50/50—is also legally insufficient. As we have said, setting cooperative sales-commission rates is not price fixing: it has no relation to the amount charged to clients for an agent's services. Thus, *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), is inapplicable. Rather, cooperative rates constitute incentives for non-listing agents to show the listed property. We found that Re/Max has made out a jury-submissible claim that Realty One's and Smythe Cramer's 70/30 and 75/25 splits constitute a boycott of Re/Max's agents, and that the policy was illegal because it was backed by the defendants' market dominance. Here, however, there is no allegation that Re/Max possesses monopoly power, or that its traditional 50% cooperative commission rate has an unreasonable effect on commerce. The fact that Re/Max franchises agree to adhere to the "going rate" cannot, under these circumstances, constitute an antitrust violation.

### B. Realty One's Business–Tort State–Law Counterclaims

■ First, Realty One claims that Re/Max personnel repeatedly told Realty One's clients that the adverse-splits policy would hurt their chances of selling their homes, and told Realty One's sales people that the policy thereby harmed them as well. Realty One maintains that these "false and maliciously wrongful attacks" constitute unfair competition and malicious interference with business relations under Ohio law. The district court dismissed the claim because Realty One provided no evidence of any agent or customer with whom Re/Max had interfered. Although it acknowledges this failure, Realty One contends that the difficulty in demonstrating which customers and which sales agents were lost as a result of the allegedly unlawful conduct "is precisely why Realty One sought and should receive injunctive protection rather than damages." However, absent the identification of any irreparable harm, this counterclaim must fail.

■ Second, Realty One claims that Re/Max engaged in malicious litigation, and points to the same evidence that the district court found supported Realty One's antitrust sham-litigation claim. Realty One cites *Water Management, Inc. v. Stayanchi*, 15 Ohio St.3d 83, 472 N.E.2d 715 (1984). That case, however, has nothing to do with malicious litigation, except for the fact that the court mentions in passing that malicious litigation is one form of unfair competition. *See id.* at 717. *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 662 N.E.2d 9 (1996), on the other hand, sets out the elements of malicious civil prosecution. One requirement is that the plaintiff's person or property have been seized during the course of the prior proceedings. *See id.* at 13. This element has not been alleged by Realty One. Thus, Realty One's state-law claims were also properly dismissed.

### V. CONCLUSION

We conclude that the district court erroneously ruled that no genuine issue of material fact exists on the issue of the plaintiffs' claims that the defendants conspired to adopt adverse commission splits. Similarly, the court failed to adequately consider evidence raised by the plaintiffs that the defendants have actually excluded competition in northeast Ohio, in violation of § 2 of the Sherman Act. Nevertheless, because their standing is limited to claims that cannot properly be brought by an existing individual franchisee, franchisors Re/Max International and Re/Max Northeast Ohio may not recover § 1 damages that duplicate any franchisee's damages. Thus, entry of summary judgment for the defendants on the franchisee-plaintiffs' § 1 claims is **REVERSED**. Judgment is **AFFIRMED IN PART, AND REVERSED**

**IN PART**, on the franchisor-plaintiffs' § 1 claims.

Summary judgment on the § 2 claims of Re/Max Crossroads, Re/Max Affinity, Re/Max Results, Re/Max Xpress, and Zames Realty was erroneously entered in light of evidence that the defendants actually excluded competition from the market. However, judgment against the remaining plaintiffs' § 2 claims was appropriate on the ground that the four-year statute of limitations had expired as to them. Therefore, judgment against Re/Max Crossroads, Re/Max Affinity, Re/Max Results, Re/Max Xpress, and Zames Realty is **REVERSED**, and that against the remaining plaintiffs is **AFFIRMED**.

The various judgments dismissing Realty One's state and federal counterclaims are **AFFIRMED**.

This case is **REMANDED** for proceedings consistent with this opinion.

### ADDENDUM

Plaintiffs A.E.B.T.S., Inc. ("Re/Max Crossroads Properties"), T.M.A.T.N.B., Inc. ("Re/Max Affinity, Inc."), D.F.I., Inc. ("Re/Max Results"), Joseph P. Grady, Inc. ("Re/Max Xpress"), McGrew Realty, Inc. ("Re/Max Key Realty"), Property Professionals, Inc. ("Re/Max Property Professionals"), Zames Realty, Inc. ("Zames Realty"), Realty Properties, Inc. ("Re/Max Realty Properties"), True Independence Partnership ("True Partnership"), and R.E.P., Inc. ("R.E.P.") are all Re/Max franchises located in northeast Ohio. Although it is unclear whether the record is complete in this regard, it appears that Re/Max franchises operate in the following northeast Ohio cities: Re/Max Crossroads has offices in Strongsville and Westlake; Re/Max Affinity, in Westlake; Re/Max Results, in Concord Township, Mentor, and Painesville; Re/Max Xpress, in North Canton; Re/Max Key Realty, in Akron; Re/Max Property Professionals, in Hudson; Zames Realty, in Mentor and Painesville; Re/Max Realty Properties, in Westlake; Re/Max Reality, in Broadview Heights; Re/Max Abbey, in Aurora; Re/Max Partners, in Canton; Re/Max Experts, in Dover; Re/Max Premier Service, in Rocky River; True Partnership, in Bay Village; and R.E.P., in Broadview Heights.

Realty One appears to have offices in Akron, Amherst, Aurora, Avon Lake, Bay Village, Brecksville, Brunswick, Chagrin Falls, Chesterland, Cleveland (3), Cuyahoga Falls, Elyria, Euclid, Garrettsville, Hudson, Lakewood, Lorain, Lynchurst, Madison Township, Maple Heights, Mayfield Village, Medina, Mentor, North Olmsted, North Ridgeville, North Royalton, Parma Heights, Pepper Pike, Rocky River, Sagamore Hills, Shaker Heights, Solon, Strongsville, Vermillion, Wadsworth, Westlake, Willowick, and Woodmere.

The record indicates that Smythe Cramer has offices in Akron, Aurora, Avon Lake, Bay Village, Brecksville, Brunswick, Canton, Chagrin Falls, Chardon, Chesterland, Cleveland Heights, Elyria, Euclid, Gates Mills, Green Township, Hudson, Lakewood, Lander Circle, Lyndhurst, Madison, Medina, Mentor, Middleburg Heights, North Olmsted, Pepper Pike, Rocky River, Seven Hills, Shaker Heights, Solon, Stow, Strongsville, Wadsworth, and Willoughby.